LLOYD v. THOMAS et al.

No. 10428.

United States Court of Appeals Seventh Circuit.

March 17, 1952.

Rehearing Denied April 28, 1952.

Smiley N. Chambers, Indianapolis, Ind., William Catlin Whitehead, Anderson, Ind., for appellants.

David M. Cook, William F. Welch, Indianapolis, Ind. (McHale, Patrick, Cook &

Welch, Indianapolis, Ind., of counsel), for appellee.

Before MAJOR, Chief Judge, and DUFFY and FINNEGAN, Circuit Judges.

FINNEGAN, Circuit Judge.

The appellants, William S. and George B. Thomas, who were defendants below, seek to reverse a judgment entered against them in the United States District Court for the Southern District of Indiana, Indianapolis Division. The judgment is based on the verdict of a jury in an action brought by Walter J. H. Lloyd, in which he sought compensation alleged to be due him as commissions under a contract with the defendants by the terms of which they employed him to promote the sale of Southern Comfort liqueur in the State of Pennsylvania. Federal jurisdiction is based on diversity of citizenship.

The complaint as amended alleges that in February 1940, the plaintiff was employed by the defendants to act as their sales representative in the State of Pennsylvania, to promote in that state the sale of a liqueur known as Southern Comfort. It charges that, at that time and throughout the time of plaintiff's employment by them, the defendants were the general sales agents of Southern Comfort liqueur in Pennsylvania, and in several other so-called "monopoly" states. It alleges that said employment contract provided that the defendants should pay to the plaintiff the sum of $2 per case for each case of said liqueur purchased by and delivered to the Pennsylvania Liquor Control Board; that in 1944 the employment contract was so modified as to provide that from January 1, 1945, the plaintiff's commission should be $1 per case. It is alleged that the calendar years 1940 to 1942 are not involved in plaintiff's claim; that during the year 1943, through the efforts of the plaintiff there were sold and delivered to the Pennsylvania Liquor Control Board, 2,410 cases of Southern Comfort on which plaintiff was entitled to $4,820, that during said year he received from the defendants only $1,800. It is charged that in 1944 the total number of cases sold and delivered to the Pennsylvania Liquor Control Board was 13,870, that plaintiff was entitled to commission on such sales in 1944 in the sum of $27,740, but received from the defendants only $2,500; that in the year 1945, there were sold and delivered to the Pennsylvania Liquor Control Board 28,010 cases, entitling plaintiff to $28,010, but that he received only $5,300 from the defendants.

There is an additional allegation that during the years 1944 and 1945 plaintiff sold to the Pennsylvania Railroad, and to the Lehigh Valley Railroad 305 cases of said liqueur, which were delivered by the defendants, and on account of which he was entitled to $610 commission. The complaint then alleges and itemizes payments by the defendants to plaintiff during the years 1943 to 1946 in the sum of $16,925.-80, and claims that there is a balance due and owing to plaintiff in the sum of $44,-254.20, judgment for which is prayed in the ad damnum clause.

In their answer, the defendants denied the allegation of the complaint as to the sale and delivery of Southern Comfort thereunder as charged in the complaint. The defendants also pleaded two affirmative defenses by way of answer, the first being that the plaintiff was employed by the Southern Comfort Corporation, and was paid in full. The second affirmative defense was that if there was a contract between the plaintiff and the defendants, it was for $1 per case of Southern Comfort sold to the State of Pennsylvania during the period in question, it is then alleged that 21,192.2 cases were sold to the State and that the defendants paid to the plaintiff the sum of $21,439.48, that in consequence there was an over-payment of $247.48 for which sum the defendants ask judgment.

The cause was submitted to a jury which found the issues for the plaintiff upon his complaint and assessed his damages at $19,780.30; on the counterclaim the jury found the issues against the defendants.

The defendants moved for judgment notwithstanding the verdict and in the alternative for a new trial. Both motions were

overruled and judgment entered on the verdict. This appeal followed.

In this court appellants claim that the errors upon which they seek to reverse the judgment against them, "arise out of instructions given and refused, rulings on evidence, failure to direct a verdict for the defendants at the conclusion of plaintiff's evidence, failure to direct a verdict for defendants at the conclusion of all the evidence, and failure to grant judgment non obstante veredicto, or motion for a new trial."

We propose to examine each of these alleged errors. First, we consider whether or not the District Court erred in refusing defendants'-appellants' motion for judgment non obstante. Under rule 50 of the Federal Rules of Civil Procedure, 28 U.S.C.A., such a motion raises only the question of law as to whether or not there is any evidence which, if believed by the jury, would authorize a verdict against the party making the motion. Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 250, 251, 61 S.Ct. 189, 85 L.Ed. 147; Marsh v. Illinois Central R. R. Co., 5 Cir., 175 F.2d 498–499.

Since the motion of the defendants to direct a verdict in their favor, made at the close of all the evidence, raised substantially the same question, it may be well to repeat here as briefly as possible the facts shown by the record in this case.

It appears that under the laws of the State of Pennsylvania during the period involved in this proceeding, that is, from 1939 to 1945, the producer of alcoholic liquors was forbidden to deal directly with consumer residents in that State. Producers were required to do business with such consumers through the Pennsylvania Liquor Control Board. The consumer could receive alcoholic liquors only by and through the Control Board. In order for a non-resident producer of such liquors to dispose of his product in that State, it was necessary for such producer to have a sales permit issued by the Liquor Control Board. Once such a vendor's permit is obtained a non-resident producer may register licensed agents who are allowed, subject to the rules of the Control Board, to promote or stimulate sales of their product covered by such sales permit. Southern Comfort was first listed by the Pennsylvania Liquor Control Board on November 6, 1936, but this listing was allowed to lapse in March, 1939.

In the latter part of 1939, or early in 1940, Walter J. H. Lloyd, plaintiff-appellee, wrote to Southern Comfort Corporation seeking employment in the sale and promotion of Southern Comfort liqueur in Pennsylvania. That company referred plaintiff's letter to the appellants. It appears that the defendants-appellants had charge of sales by the Southern Comfort Corporation of its liqueur in the eight or ten so-called "monopoly" states, including Pennsylvania, during all the years involved in this controversy.

Subsequently, and early in 1940, plaintiff met with the defendants. At the initial meeting arrangements were made for the plaintiff to assist in having Southern Comfort liqueur relisted in Pennsylvania, and to become the representative of the defendants in the sale and promotion of that product in the State. The plaintiff testified that at this meeting defendants agreed to pay plaintiff a commission of $3.00 per case on special orders for Southern Comfort until the product was listed in Pennsylvania. This was the same commission paid to the defendants by the Southern Comfort Corporation.

By letter, dated June 23, 1940, the defendants sent to plaintiff their check for $30 which was expressed to be "for ten cases remitted for by your state." In that same letter defendants informed the plaintiff that Southern Comfort Corporation had no right to interfere in defendant's organization, and that they would not allow officers of that corporation to hire their salesmen.

In August, 1940, Southern Comfort liqueur was again listed in the State of Pennsylvania. The plaintiff testified that at that time his commission was reduced to $2 per case. The testimony of defendants

was that the commission rate to plaintiff was at all times $1 per case.

At any rate plaintiff continued his activities in the sale and promotion of Southern Comfort liqueur in Pennsylvania. He testified that because of increased sales his commission rate was reduced to $1 per case, effective in January, 1945. During the years 1940 to 1946, inclusive, plaintiff received periodic advances in money from the defendants, but he claims there was never any accounting of the actual amount due from the defendants. Beginning in early 1942, plaintiff claims that he was to receive a commission of $1 per case on all sales by district representatives employed in one or other of the four Pennsylvania districts to sell Southern Comfort liqueur. When there was no district representative plaintiff claimed he was entitled to $2 per case. It appears from the testimony of one of the defendants, William S. Thomas, that a district representative, William Fifeck, was appointed during a short period in the Pittsburgh district. He appears to have been the only district representative appointed. Mr. Thomas testified that Fifeck was paid $1 per case on sales made by him in the Pittsburgh district, and that plaintiff was likewise paid $1 on each such case.

From a stipulation entered into by the parties it appears that during the period involved in this controversy, that is to say, during the years 1943 to 1945 inclusive, there were sold, delivered and paid for by the State of Pennsylvania 33,535 cases of Southern Comfort liqueur. During that period defendants issued and plaintiff received checks in the total sum of $18,347.-06.

Based upon the plaintiff's claim that his commission was $2 per case during the years 1943 and 1944, and only $1 per case during the year 1945, these figures would indicate that the plaintiff's entire commission during the period was $41,720.00, he was paid $18,347.06, leaving a balance due him of $23,372.94. Plaintiff, however, asserts that more than $2,000 of the sums paid him by checks was for expenses and other services performed by him for the defendants, and that the actual balance due him was $26,230.47.

Defendants, on the other hand, based on their claim that plaintiff's commission was $1 per case, assert that plaintiff was actually overpaid, and that there is now due from him and owing to them the sum of $247.48. There are other controverted facts in this controversy which, in our opinion, can be better considered in our discussion of the rulings of the trial court and on the admission of evidence and the instructions of the court to the jury.

 The foregoing résumé, however, is sufficient to establish that there is ample evidence in this record, which, if credited by the jury, justified its verdict finding the issues for plaintiff on his claim and against defendants on their counterclaim. The District Court properly denied the defendants' motion for judgment notwithstanding the verdict.

 For the same reasons we must hold that defendants' motions for a directed verdict, at the close of plaintiff's case, repeated at the close of all the evidence, were properly denied.

The motion for a new trial made by defendants is based upon and restates the remaining "alleged errors" upon which they rely for a reversal of the judgment under review. We proceed, therefore, to consider such alleged errors and the merits of the defendants' motion for a new trial.

It will be recalled that by way of affirmative defense the defendants alleged that plaintiff was, in fact, employed by the Southern Comfort Corporation as a sales agent, in the State of Pennsylvania, and was paid in full by that company.

The record disclosed that in August, 1945, the Southern Comfort Corporation notified defendants that their contract as sales representative of that company, dated September 18, 1940, and extended from year to year, because of greatly increased sales of Southern Comfort liqueur would be cancelled. The latter said: "This is to advise you that the agreement will have to be amended. We are working on it now and will advise you within the very near future

of the conditions which will have to govern for the coming year."

As a result of this notice of August, 1945, a controversy arose between Southern Comfort Corporation and the defendants. Lawyers were employed by the defendants, and various conferences were had with Southern Comfort Corporation and its agents. The plaintiff and his personal attorney apparently afforded some assistance to the defendants in the matter, but it was impossible for defendants and the Southern Comfort Corporation to arrive at a revamping of their sales representation contract. Finally, on December 29, the controversy was settled by the payment of a sum of money agreement to defendants. A copy of the settlement was admitted in evidence in the present proceeding over the objection of the defendants. The settlement agreement provided in part: "The said George Thomas and Wm. Thomas on behalf of themselves, collectively, jointly and individually and on behalf of their joint, collective and individual heirs, legatees, assigns and legal representatives do hereby assert and declare that they have not individually or jointly made any commitment, agreement, promise or contract orally or in writing to or with any person, groups of persons, firms, partnership, company or corporation in the name of or on behalf of the Southern Comfort Corporation of St. Louis, Missouri, a Missouri Corporation, and the said George Thomas and Wm. Thomas on behalf of themselves, collectively, jointly and individually and on behalf of their individual and joint heirs, legatees and assigns hereby indemnify and guarantee the Southern Comfort Corporation of St. Louis, Missouri, a Missouri Corporation, against any and all loss, damage, expense, irrespective of the nature of the expense, occasioned by the assertion of any claim by any person, groups of persons, firm, partnership, company or corporation, occasioned, based or bottomed on any oral or written contract, commitment, promise or agreement made by William Thomas and George Thomas either or both and attempting to bind the Southern Comfort Corporation to such oral or written contract, commitment, promise or agreement."

■■ The representations and promises made by the defendants in the settlement with Southern Comfort Corporation were a complete and effective refutation of the claim advanced by them in their first affirmative defense. In our opinion the agreement was properly admitted in evidence.

■ It is next urged that it was error for the court to permit the jury to pass upon the termination of the contract, that, as defendants put it: "The court was bound to instruct the jury that termination could not go beyond September 18, 1945."

We are not impressed by the argument. In the letter to plaintiff, dated November 29, 1945, in evidence as plaintiff's exhibit 29, the defendants say: "We just recd the order from your state and are forwarding it on in." Moreover, the record shows that the plaintiff and his personal attorney worked with and assisted defendants in their controversy with Southern Comfort Corporation concerning the termination of defendants' contract. The controversy was not settled until December 29, 1945, the date of the settlement agreement. There is no evidence that plaintiff was notified to cease selling and promoting Southern Comfort liqueur in Pennsylvania during 1945. The evidence is to the contrary. As we have heretofore pointed out, orders were accepted and forwarded by defendants long after September 18, 1945.

The last of the alleged errors relied on for reversal of this judgment have to do with the instructions given the jury by the trial court and with certain instructions submitted by the defendants and refused by the trial court.

At the close of all the evidence the judge indicated to counsel for both parties that he desired to confer with them in regard to the instructions to be given to the jury. Apparently such a conference was held and both parties through their counsel submitted forms of instructions which they regarded as proper to be given.

At the next session of court the defendants, and each of them, excepted to the instructions which the court had indicated it would give. The defendants in such

objections quoted verbatim the instructions as actually given to the jury by the trial court, but did not specifically state the ground on which they based their objections. Defendants' exceptions concluded: "the defendants and each of them separately and severally except to the rulings of the court refusing and failing to give defendants tendered instructions which were numbered from 1 to 9," and proceeds to copy verbatim the instructions submitted by the defendants.

Rule 51 of the Federal Rules of Civil Procedure provides as follows: "No party may assign as error the giving or failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects *and the grounds of his objection.* Opportunity should be given to make the objection out of the hearing of the jury."

In Hansen v. St. Joseph Fuel Oil & Mfg. Co., 181 F.2d 880, 886, the Court of Appeals for the Eighth Circuit said that Rule 51 is a mere restatement of what federal courts have held long prior to the adoption of the Rules of Civil Procedure. It pointed out that the reason for the rule is that fairness to the trial court and to the parties to an action requires that objections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error. It concludes with this language, on page 886 of 181 F.2d: "Neither this court nor the trial court is under the duty of assuming the burden of comparison and analysis of the charge given and the instructions requested which appellant attempts to place upon them."

It is a well-settled rule in the federal courts, supported by a long line of cases, that general exceptions like those here taken by defendants cannot be regarded as directing the mind of the court to any specific alleged error. Such general objections do not save any question for review. Beaver v. Taylor, 93 U.S. 46, 23 L.Ed. 797; Jones v. East Tennessee, Virginia & Georgia R. R. Co., 157 U.S. 682, 15 S.Ct. 719, 39 L.Ed. 856; Detroit Edison Co. v. Stricker, 6 Cir., 65 F.2d 126, and Hall v. Aetna Life Insurance Co., 8 Cir., 85 F.2d 447.

We might, under the circumstances, refuse to consider the objections and exceptions of the defendants to the instructions given by the District Court. However, their contentions concerning alleged interpolations in certain exhibits, are argued at such length and with such vehemence that we have determined to consider them as if objections had been properly made.

A short statement of what the record discloses about these alleged insertions is here proper.

Plaintiff during the presentation of his case in chief offered in evidence many letters written to him by the defendants. In three of these letters, exhibit 3, dated March 2, 1941; exhibit 4, dated January 31, 1942, and exhibit 10, dated March 13, 1942, it was apparent that insertions or interpolations had been made at the ends of certain paragraphs on a typewriting machine of different make from that used in typing the body of the letters. All such insertions had reference to the amount of commissions to be paid the plaintiff. Plaintiff testified that the letters had been in his possession since he received them through the mail, and that he did not make or procure anybody else to make any of the said insertions.

In presenting their defense, the defendants offered the testimony of an expert, whom they had employed, and whose competency is unquestioned. He testified that the insertions in exhibits 3, 4 and 10 were typed on an Underwood typewriter and that the body of each of said exhibits was typed on a Royal Elite typewriter. He made no examination to determine whether or not the same Royal and Underwood machines were used in each instance. The defendants contended that the insertions were made after they had placed the letters in the United States mail.

On rebuttal the plaintiff procured and tendered, as his own witness the same expert who had been used by the defend-

ants. He was shown plaintiff's exhibit 12, a letter dated November 25, 1944, to the body of which a postscript had been added. The postcript related to the deduction of federal taxes from sums paid the plaintiff. The expert testified that the body of the letter, exhibit 12, had been typed on a Royal Elite typewriter and that the postscript thereto had been typed on an Underwood machine. In sur-rebuttal the defendant, George Thomas, who testified that he typed all the letters of defendants in evidence, when asked as to whether or not he had typed the postscript in exhibit 12, said: "I suppose I did if it is there—I don't know." This closed the case. The defendants in their suggested instructions omitted all mention of the testimony in regard to the insertion in exhibit 12, although they went into considerable detail in stating what the jury might consider in order to determine whether or not plaintiff was responsible for the alleged interpolations in the exhibits. Defendants' failure in this regard justified the trial court in refusing to give the suggested instructions.

The trial court actually instructed the jury as follows: "Evidence has been introduced in this case respecting certain alleged material alterations of letters introduced by the plaintiff and bearing plaintiff's exhibit numbers 3, 4, 10 and 12, as evidence both of the existence and the terms of a contract between the plaintiff and the defendants. Whether the alleged material alterations were, in fact, made, and whether they were, in fact, made by the plaintiff, or by someone under his authority or with his knowledge, or consent, is for you, the jury, to determine, considering the character of the alleged changes, whether or not they were made on a different typewriter than the one upon which the body of the letter or letters were written, whether or not there is in existence a carbon copy of one or more of those letters which does not contain the additions made thereto, who would benefit by the change, together with all other facts and circumstances in evidence bearing upon that question. If you find, from a fair preponderance of all the evidence bearing on this issue, that material alterations on any or all of the letters or exhibits in question were made, and that they were made by the plaintiff, or by someone under his authority, or with his knowledge or consent, then I instruct you that you should disregard, as evidence in this case, all of such letters and exhibits as you may find contain such material alterations, insofar as such letters and exhibits tend to prove the plaintiff's complaint."

The instruction, as given, was in our opinion vulnerable to objection by the plaintiff. He, however, is not making objection. The defendants have no legitimate ground for complaint.

 They insist, however, that the instruction should have informed the jury that it must infer that the changes in the letters were fraudulently made for the purpose of cheating and defrauding the defendants and to support a dishonest claim based wholly or partly upon such letters. They likewise insist that the court should have instructed the jury that the plaintiff's action in producing such letters and relying thereon was an admission that he could not support his claim by honest proof.

The defendants are seeking too wide an extension of the maxim "in odium spoliatoris."

In Nowack v. Metropolitan Street Railway Co., 166 N.Y. 433, 60 N.E. 32, 33, 54 L.R.A. 592, it is said in regard to fabricated evidence: "Evidence tending to show that a party to an action tried to bribe a witness to give false testimony in his favor, although collateral to the issues, is competent as an admission by acts and conduct that his case is weak and his evidence dishonest. It is somewhat like an attempt by a prisoner to escape before trial or to prove a false alibi, or by a merchant to make way with his books of account, except that it goes further than some of these instances; for, in addition to reflecting on the case, it reflects upon the evidence on that side of the controversy. 'Where, it appears that on one side there has been forgery or fraud in some material parts of the evidence, and they are discovered to be the contrivance of a party to the proceeding,

it affords a presumption against the whole of the evidence on that side of the question, and has the effect of gaining a more ready admission to the evidence of the other party.' 1 Phil.Ev. (Cowan & H. Notes) 627. It is not conclusive, even when believed by the jury, because a party may think he has a bad case when in fact he has a good one, but it tends to discredit his witnesses and to cast doubt upon his position. It is for the consideration of the jury, after ample opportunity for explanation and denial, under proper instructions to prevent them from giving undue attention to the collateral matter to the detriment of the main issue. The leading authority in support of such evidence is an English case, decided after careful argument by counsel and upon full discussion by the judges. Moriarty v. London, C. & D. Railway Co., L.R. [5 Q.B.] 314."

Cockburn, C. J., in Moriarty v. R. R. Co., R. 5 Q.B. 319, said: "So if you can show that a plaintiff has been suborning false testimony and has been endeavoring to have recourse to perjury, it is strong evidence that he knew perfectly well that his cause was an unrighteous one. I do not say that it is conclusive, I fully agree that it should be put to the jury with the intimation that it does not always follow because a man not sure he shall be able to succeed by righteous means has recourse to means of a different character than that which he desires, namely, the gaining of a victory, is not his due, or that he has not good evidence for believing that justice entitled him to it."

In the case at bar, it seems perfectly plain that the jury did not find that the alleged interpolations in the four letters were made by the plaintiff or under his direction. The trial court, since he refused to find the verdict to be contrary to the evidence, must have agreed with the jury in that regard. We have no right to substitute our judgment for theirs.

Our examination of this record convinces us that the lower court has done justice between the parties. We can find no error that would justify us in reversing the judgment it entered. It is therefore affirmed.